UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| GARY LEE LOYER, SR., as Personal Representative for the Estate of GARY LOYER, Deceased, <br><br>                     Plaintiff, <br><br> v. <br><br> WAYNE COUNTY MICHIGAN et al., <br><br>               Defendants. | Case No. 21-12589 <br> Honorable Shalina D. Kumar <br> Magistrate Judge Curtis Ivy. Jr. |

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 47)**

## I.   Introduction

Plaintiff Gary Loyer, Sr., as Personal Representative for the Estate of Gary Loyer ("plaintiff estate" or "plaintiff"), sued defendants Wayne County ("County") and several individual county officials[1] in their official capacity

---

[1] As set forth in the First Amended Complaint ("FAC"), plaintiff estate sues Daniel Pfannes, Undersheriff for the Wayne County Sheriff's Office, Robert Dunlap, Chief of Jails and Court Operations, James E. David, Deputy Chief of Jail Operations, and Raphael Washington, Wayne County Sheriff. *See* ECF No. 5.

under 42 U.S.C. § 1983 for violations of plaintiff decedent's Eighth and Fourteenth Amendment rights in connection with his death by suicide while in custody at the Wayne County Jail ("WCJ"). ECF No. 5. Defendants filed a motion for summary judgment on all claims. ECF No. 47. The motion was fully briefed, and the Court heard oral argument on March 12, 2025. ECF Nos. 50, 51, 52. For the reasons set forth below, the Court grants the motion.

## II.    Factual Background

Gary Loyer was booked into WCJ on charges of armed robbery on the evening of January 31, 2020. ECF No. 47-2. The following day he was screened by an employee of Wellpath, the medical service provider for WCJ. ECF No. 47-3. During that screening, Loyer indicated that he did not have a current or past mental health diagnosis, had not been prescribed medication for emotional or mental health problems, was not a current or past consumer of mental health treatment, did not have concerns about his ability to cope emotionally or manage stress, did not have feelings of hopelessness/helplessness, had not had thoughts of killing himself, and he

had not attempted suicide in the past.[2] *Id*.; ECF No. 50-1, PageID.644-649.

Loyer's only risk factor identified on his mental health screen, his current

charge of armed robbery, prompted only a routine, not an urgent or STAT

referral to Wellpath's mental health service and did not warrant placement

on suicide watch. ECF No. 47-3, PageID.503; ECF No. 50-1, PageID.649.

Loyer's screening indicates that he was recommended for placement in

general population housing. ECF No. 47-3, PageID.505; ECF No. 50-1,

PageID.651.

---

[2] Plaintiff states in its response brief that "[d]uring Loyer's February 1, 2020 medical screening, he reported a history of psychiatric illness, daily methamphetamine abuse, and severe withdrawal symptoms, including hallucinations. (Ex. 7 Loyer Medical Records). Staff noted he was 'uncooperative,' 'very anxious,' and 'angry.' *Id.*" But, as set forth here, the records cited reveal the opposite: A history of psychiatric illness was specifically denied, as was current or prior withdrawal. ECF No. 50-1, PageID.647-48. For behavior, the box for "uncooperative" was not checked; the box checked noted Loyer's behavior as "appropriate." "Anxious" and "Angry" were options to describe mood, but neither were checked for Loyer. *Id*. at PageID.644. Instead, "Unremarkable" was selected. *Id*. At the hearing on this matter, the Court admonished plaintiff's counsel for including Artificial Intelligence(AI)-generated bogus legal citations in plaintiff's response brief and ordered him to attend an ethics seminar. *See* ECF No. 68. This brazen factual fabrication, perhaps also the result of counsel's inappropriate dependence on AI, cannot be tolerated; the Court strongly urges counsel to exercise greater vigilance in preparing court-filings that are factually and legally accurate. Further transgressions of this sort will result in disciplinary action.

Loyer was housed in Division 2 of WCJ, known as "the old jail," and assigned a bunk in Ward 208, Cell 6. ECF No. 47-2. On February 8, 2020, Loyer did not appear depressed or suicidal to other inmates and at least one observing corrections officer ("CO"). ECF No. 47-10, PageID.525, 530, 535; ECF No. 50-1, PageID.660; ECF No. 69, PageID.1286. In response to the Detroit Police Department ("DPD") investigation of Loyer's suicide, one inmate speculated that Loyer may have been depressed but never said anything: "He was very fidgety and he kept talking about how he was going to beat his case." ECF No. 47-10, PageID.525. Another inmate noted that he had played cards with Loyer a couple times, and Loyer did not seem suicidal or depressed. *Id.* at PageID.530. Another reported, "he sounded normal, like the day before." *Id.* at 533. The DPD report reflects two other inmates who stated that Loyer "didn't seem to have anything wrong with him" and that "Loyer's death came as a surprise because it didn't seem like anything was bothering him." ECF No. 50-1, PageID.660.

According to WCJ records, CO Marcus Washington completed his rounds of Wards 208-209 at 11:09 p.m. *Id.* at 689. CO James Olivero began his rounds at approximately 11:37 p.m. *Id.* At approximately 11:40 p.m. Olivero approached Loyer's cell and noticed a sheet had been placed

in the cell, partially obstructing the view inside, and called out to Loyer to remove it. *Id.* at PageID.670. When he received no response, he observed that Loyer was sitting on the floor against the bars with a knot in the sheet above him. *Id.* Olivero called for Washington and CO Joshua Nutter to pull the duress alarm, which did not sound, and to call a Code 2. *Id.* Nutter responded to the scene and assisted with cutting the sheet from Loyer's neck. *Id.* The COs performed CPR until Wellpath nurses, and eventually Detroit EMS, arrived to take over lifesaving measures. Loyer was pronounced dead at 12:27 a.m. on February 9, 2020. *Id.*

The investigation revealed that Loyer left a suicide note, which was found in his cell, and the Wayne County Medical Examiner classified his death as a suicide. ECF No. 47-5; ECF No. 47-6.

Plaintiff estate claims defendants violated Loyer's Fourteenth Amendment rights by failing to thwart his suicide. ECF No. 5 (Count III). Plaintiff also asserts several state law claims against defendants, including wrongful death, gross negligence, and intentional infliction of emotional distress. *Id.* (Counts I, II, IV, V). Plaintiff asserts that the County and the individually named county officials were deliberately indifferent to Loyer's known risk of suicide. Specifically, plaintiff argues that the County's failure

to repair video cameras in WCJ areas housing suicidal inmates amounted to deliberate indifference. *See* ECF No. 50. Plaintiff also contends that the COs on duty the night of Loyer's suicide failed to conduct the WCJ-mandated 30-minute checks. *Id.* at PageID.556. Defendants contend that they are entitled to summary judgment because there is no evidence that Loyer demonstrated a risk of suicide while in WCJ custody, nor is there evidence that the County had a custom, policy, or practice of indifference to known risks of suicide. ECF No. 47, PageID.480. Furthermore, the individual defendants contend that plaintiff sued them in their official capacities only (as spelled out in the FAC), and thus only asserted clams against the municipality. ECF No. 47.

### III.   Analysis

#### A. Standard of Review

Summary judgment is appropriate where the evidence in the record, viewed in its entirety, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Additionally, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party, who must come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must

designate specific facts in affidavits, depositions, or other factual material

showing "evidence on which the jury could reasonably find for the [non-

movant]." *Anderson*, 477 U.S. at 252. However, mere allegations or denials

in the non-movant's pleadings will not satisfy this burden, nor will a mere

scintilla of evidence supporting the non-moving party. *Id*. at 248, 251.

If the nonmoving party fails to make a sufficient showing on an

essential element of its case with respect to which it has the burden of

proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at

323. The court must construe Rule 56 with due regard not only for the

rights of those "asserting claims and defenses that are adequately based in

fact to have those claims and defenses tried to a jury," but also for the

rights of those "opposing such claims and defenses to demonstrate in the

manner provided by the Rule, prior to trial, that the claims and defenses

have no factual basis." *Id*. at 327.

### B. Deliberate Indifference

Plaintiff asserts that the County and the individual defendants were

deliberately indifferent to Loyer's known risk of suicide. ECF No. 50. As

defendants point out, plaintiff estate sued the individual defendants in their

official capacities only. *See* ECF No. 5. Official capacity claims are different

from claims against defendants in their individual capacity. *See Essex v. Livingston Cnty.*, 518 F. App'x 351, 354 (6th Cir. 2013) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985)). Government officials face personal liability when sued in their individual capacity whereas officials sued in their official capacity expose only the government entity to liability. *Id*. "In other words, an official-capacity claim is merely another name for a claim against the municipality." *Id*. (citing *Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009)).

A municipal entity cannot be liable under § 1983 if there is no underlying constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); A court's finding that an individual defendant is not liable for a constitutional violation, however, does not necessarily foreclose municipal liability. *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 389 (6th Cir. 2018). Under certain "circumstances a municipality can be liable when the plaintiff suffered a constitutional violation but cannot attribute it to any individual defendant's unconstitutional conduct." *See id*. (collecting cases). A municipality may be liable based on the actions of individual government actors other than those who are named as parties. *Winkler v. Madison*

*Cnty.*, 893 F.3d 877, 900 (6th Cir. 2018) (quoting *Epps v. Lauderdale*, 45 F. App'x 332, 334–35 (6th Cir. 2002) (Cole, J., concurring)).

Here, plaintiff has not alleged, nor provided evidence that any named defendant or WCJ officers violated Loyer's constitutional rights. None of the named defendants had any interaction or involvement with Loyer during his time in WCJ. *See* ECF No. 5*; see Doe v. Jackson Loc. Sch. Dist. Bd. of Ed.*, 954 F.3d 925, 934 (6th Cir. 2020) (under § 1983, defendants may only be liable for their own conduct, not for the conduct of others under a vicarious-liability theory). Nor has plaintiff offered evidence to support that any of the unnamed officers who did interact with Loyer were deliberately indifferent to a substantial risk of harm he faced. *See Lawler v. Hardeman Cnty.*, 93 F.4th 919, 926 (6th Cir. 2024) (internal quotation omitted).

Jail staff may violate the Due Process Clause by failing to protect pretrial detainees from harm, including failing to thwart a detainee's suicide. *Id*. at 926 (citing *Downard v. Martin*, 968 F.3d 594, 598-99 (6th Cir. 2020)). Failure-to-protect claims carry both objective and subjective elements: "Objectively, [pretrial detainees] must have faced a 'substantial risk of serious harm'" and "[s]ubjectively, officers must have acted with 'deliberate indifference' to this risk." *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 834

(1994)). Prior to 2023, a pretrial detainee had to prove that an officer both subjectively knew of the facts that created a substantial risk of serious harm to the detainee and that the officer subjectively concluded that the risk existed. *Id*. at 926-27.

Most cases addressing inmate suicides hinge on the subjective element. *Id*. at 929. This element requires a detainee "to prove that an officer knew of the facts creating the substantial risk of serious harm[,]…that the officer believed that this substantial risk existed, [a]nd… that the officer 'responded' to the risk in an unreasonable way." *Id*. (quoting *Farmer*, 511 U.S. at 844 and citing *Beck v. Hamblen Cnty*. 969 F.3d 592 , 601–02 (6th Cir. 2020)). Because detainees "often take their lives 'without warning,' [such that] jail staff will find it 'difficult' to identify the inmates who pose substantial suicide risks[,]…an estate must prove more than that an officer knew of a 'possibility' or 'even a likelihood' of the suicide." *Id*. (quoting *Andrews v. Wayne Cnty*, 957 F.3d 714, 717 (6th Cir. 2020) and *Downard*, 968 F.3d at 601). "Rather, the officer must have believed that a 'strong likelihood' existed that the inmate would commit suicide." *Id*. (quoting *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992)).

Rarely will correction officers admit they knew of a strong likelihood that an inmate would try to kill themselves, so estates must often rely upon circumstantial evidence to establish the officer's knowledge. *Id*. "[C]aselaw sets a 'high bar' for plaintiffs who try to prove an officer's knowledge in this circumstantial way." *Id*. (citing *Downard*, 968 F.3d at 601). Required evidence includes that an officer knew of an inmate's "suicide watch" classification. *Id*.

The Sixth Circuit found that this high evidentiary bar was "met when an inmate told officers that he was suicidal and needed to go to the hospital and when the officers knew that he had recently been released from a mental-health facility." *Id*. at 929-30 (citing *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 408–10 (6th Cir. 2015)). The Sixth Circuit likewise "found the bar met when an officer knew of the inmate's past suicide attempts, knew that the inmate had recently been placed on suicide watch, and knew that the inmate was complaining of pain and crying out to go to the hospital." *Id*. at 930 (citing *Schultz v. Sillman*, 148 F. App'x 396, 401–03 (6th Cir. 2005)). To the contrary, the court "granted summary judgment to an officer even though she knew that the deceased inmate seemed despondent." *Id*. (citing *Downard*, 968 F.3d at 601–02). It also "granted

Page **12** of **22**

summary judgment to medical staff even though they knew that the deceased inmate had been suffering from drug withdrawals and refusing medication and meals." *Id.* (citing *Broughton v. Premier Health Care Servs.*, 656 F. App'x 54, 57–58 (6th Cir 2016)). And finally, the court "granted summary judgment to a jail doctor who knew of an inmate's prior attempt to harm himself and recent suicidal thoughts because the inmate had said that he no longer felt suicidal." *Id.* (citing *Nallani v. Wayne Cnty.*, 665 F. App'x 498, 507–08 (6th Cir. 2016)).

Guided by this precedent, plaintiff estate here clearly lacks evidence from which a reasonable jury could find the COs responsible for Loyer believed there was a strong likelihood that he would commit suicide. Loyer denied any past suicide attempts and any current suicidal thoughts during his intake screening eight days before his suicide. ECF No. 50-1, PageID.649. He also denied ever or currently suffering from withdrawal and denied a current or past psychiatric diagnosis. *Id.* at 647-48. Nor does plaintiff estate supply evidence that Loyer said or did anything to suggest that he would take his own life. The guards and other inmates on his ward indicated that he played cards with other detainees earlier the day he committed suicide. ECF No. 47-10, PageID.530; ECF No. 69,

PageID.1286. One inmate described Loyer as fidgety and maybe depressed, ECF No. 47-10, PageID.525, but even if the officers interacting with Loyer knew of those observations, they fall far short of those required to meet the high bar for proving a strong likelihood for committing suicide. *See Lawler*, 93 F.4th at 931 (caselaw forecloses any reliance on generic risk factors such as substance abuse problems or even historical suicide attempts); *see also Downard*, 968 F.3d at 601–02) (knowledge that inmate was despondent was not knowledge of strong likelihood of suicide); *Broughton*, 656 F. App'x at 57–58 (medical staff's knowledge that deceased inmate had been suffering from drug withdrawals and refusing medication and meals did not equate to knowledge of strong likelihood of suicide). Without evidence that any officer knew of a strong likelihood that Loyer would commit suicide, plaintiff could not satisfy the subjective element for a deliberate indifference claim under the Due Process Clause of the Fourteenth Amendment. Accordingly, a municipal liability claim against the County cannot arise from an individual CO's violation of Loyer's constitutional rights.

A finding that no individual defendant violated the plaintiff's constitutional rights often means that the plaintiff has suffered no

constitutional violation. *North*, 754 F. App'x at 390. And a constitutional violation is required for municipal liability to lie. *Est. of Andrews v. City of Cleveland*, 112 F.4th 436, 450 (6th Cir. 2024); *see also Epps*, 45 F. App'x at 334 (Cole, J., concurring) (*Heller* prohibits municipal liability when the victim suffers no constitutional injury at all). Nevertheless, "it is proper to consider possible constitutional violations committed by a municipality qua municipality, even in the absence of a showing of a constitutional violation by any one individual officer." *Grote v. Kenton Cnty.*, 85 F.4th 397, 414 (6th Cir. 2023).

Plaintiff's efforts to demonstrate that the County itself violated Loyer's constitutional rights also fail. To establish municipal liability, "a plaintiff must prove: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance of or acquiescence to federal rights violations." *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019) (internal quotation and marks omitted). "[T]o hold a municipality liable under § 1983, a plaintiff must prove that the municipality's policy or custom *caused* the alleged injury." *Ouza v. City of Dearborn Heights*, 969 F.3d 265,

286 (6th Cir. 2020) (internal quotation marks and citations omitted)
(emphasis added). A plaintiff "must identify the policy, connect the policy to
the [county] itself and show that the particular injury was incurred because
of the execution of that policy." *Andrews*, 957 F.3d at 721-22.

Plaintiff, emphasizing media reports of WCJ's historically high rate of
suicides, argues that WCJ's "long-standing failure to repair known camera
blind spots in areas housing suicidal inmates…typifies the kind of custom of
tolerance or acquiescence giving rise to *Monell* liability." ECF No. 50,
PageID.563. To succeed on a custom of tolerance or acquiescence claim
for municipal liability, a plaintiff must prove the following: (1) the existence
of a clear and persistent pattern of illegal activity; (2) notice or constructive
notice on the part of the municipality; (3) the municipality's tacit approval of
the unconstitutional conduct, such that their deliberate indifference in their
failure to act can be said to amount to an official policy of inaction; and (4)
that the municipality's custom was the moving force or direct causal link in
the constitutional deprivation. *Stewart*, 788 F. App'x at 347-48 (quoting
*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005))
(quotation marks omitted).

Assuming for the sake of argument that plaintiff could satisfy the first three prongs of this requirement—that the County's refusal to repair cameras in the WCJ areas housing suicidal inmates equated to an official policy of inaction, it cannot satisfy the fourth prong. In other words, plaintiff cannot establish that the absence of cameras in areas housing suicidal inmates was the direct causal link to the County's failure to thwart Loyer's suicide. Plaintiff has not offered plausible evidence that Loyer was housed in an area designated for suicidal detainees.[3] To the contrary, the record evidence supports defendants' assertion that Loyer was housed in a general population ward. *See* ECF No. 50-1, PageID.651, 755; ECF No. 69, PageID.1282. Nor, as discussed above, can plaintiff point to any evidence to support that Loyer identified or demonstrated any suicidal

---

[3] As pointed out at the hearing on this motion, plaintiff relies solely on a screenshot of a list of detainees in Ward 208, which contains this notation at the bottom: "SUICIDE  WARD 208  TIME: 0004 HOURS  CASE # 1988-20 OIC OFFICER JAMES OLIVERO" to support its claim that Loyer was housed on a suicide ward. ECF No. 50-1, PageID.657. At the hearing, counsel for defendants indicated that the word "Suicide" in that footer refers to the event, followed by the location where the event occurred, "Ward 208." In other words, "suicide" does not modify "Ward 208." Even if the Court accepted plaintiff's interpretation that this footer refers to Ward 208 as Suicide Ward 208, this footer is not "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "A mere scintilla of evidence supporting the non-moving party" does not create a genuine issue of material fact. *Id*. at 248, 251.

tendencies prior to taking his life, such that he belonged anywhere other than the general population ward. *See* ECF No. 47-10, PageID.525, 530, 535; ECF No. 50-1, PageID.644, 647-48, 660. Finally, plaintiff does not allege or argue that camera disrepair in the general population areas of the jail amounts to deliberate indifference to a known risk of suicide. Accordingly, notwithstanding known and longstanding nonfunctioning cameras within WCJ, plaintiff cannot establish municipal liability against the County under a custom or tolerance or acquiescence theory because Loyer's suicide would not have been prevented by the presence of working cameras in the areas housing suicidal inmates.

Plaintiff's brief in response to defendants' motion hints at the assertion of a failure to train argument. ECF No. 50, PageID.564. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived—it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *Alston v. City of Detroit Police Officers*, 717 F. Supp. 3d 618, 628–29 (E.D. Mich. 2024) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (cleaned up). Even if the Court does not deem the superficial nature of that allusion as a waiver of such an

argument, plaintiff cannot demonstrate deliberate indifference based on inadequate training.

"To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza*, 969 F.3d at 286-87. A plaintiff may establish that inadequate training results from municipal "deliberate indifference by showing that the municipality has failed to act in response to repeated complaints of constitutional violations by its officers." *Id*. at 287 (internal quotations omitted). Alternatively, "a plaintiff can show that a municipality was deliberately indifferent by failing to equip law enforcement officers with specific tools to handle recurring situations." *Id*. (quoting *Bd. of Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)) (cleaned up).

Plaintiff has not offered evidence that the County failed to act in response to repeated complaints of constitutional violations by its officers. *See id*. Moreover, even if plaintiff had evidence (which it does not)[4] that the

---

[4] Plaintiff's response brief, citing generally to defendants' discovery responses, states that defendants could identify only two officers who had received suicide prevention training in the three years before Loyer's death.

Page **19** of **22**

County failed to provide its officers with any suicide prevention training and that the need to train officers to recognize and respond to inmates demonstrating suicidal tendencies was so obvious that the failure to do so could be characterized as deliberate indifference to constitutional rights, it would still have to prove that the failure to train caused the defendants' failure to prevent Loyer's suicide. *See Jackson v. City of Cleveland*, 925 F.3d 793, 837 n.26 (6th Cir. 2019) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006) (cleaned up) ("A failure-to-train claim…requires showing that the failure to train "was closely related to or actually caused plaintiff's injury."). Once again, the absence of evidence that Loyer voiced or exhibited any suicidal propensities to anyone prior to taking his life would be fatal to such an argument. Officers trained in recognizing and responding to signs of suicidal intent can only do so if such signs are displayed. Here, as discussed, plaintiff has not identified any remark or conduct from Loyer that would have alerted a properly trained officer to the risk of his suicide. In other words, plaintiff lacks evidence that further training would have prevented Loyer's suicide.

---

ECF No. 50, PageID.557. In its review of the discovery responses attached to plaintiff's response brief, the Court found no information related to suicide prevention training. *See* ECF No. 50-1, PageID.713-32.

In sum, notwithstanding the much-publicized spate of suicides at WCJ several years ago, plaintiff has not supplied evidence that working cameras in the areas housing suicidal inmates, or correction officers more fully trained for suicide prevention could have thwarted Loyer's suicide. Accordingly, plaintiff cannot prove, as it must, that any municipal policy was the moving force in defendants' failure to prevent Loyer's suicide. The County is thus entitled to summary judgment on plaintiff's municipal liability claim.

### C. State Law Claims

Defendants argue that they are entitled to absolute governmental immunity from all potential state law tort liability to plaintiffs. Because plaintiff does not address this argument or its state law claims in its response to defendants' motion for summary judgment, these claims are deemed abandoned. *See Briggs v. University of Detroit-Mercy*, 611 F. App'x 865, 870 (6th Cir. 2015).

### IV.    Conclusion

For these reasons, the Court **GRANTS** defendants' motion for summary judgment (ECF No. 47) and **DISMISSES WITH PREJUDICE** plaintiff's FAC (ECF No. 5). This matter is now closed.

**IT IS SO ORDERED**.

s/ Shalina D. Kumar
SHALINA D. KUMAR
Dated: March 21, 2025                 United States District Judge